UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| ISAAC PEREZ, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 1:17 C 8386 |
| | ) | Hon. Marvin E. Aspen |
| WEXFORD HEALTH SOURCES, INC, | ) | |
| THE ESTATE OF SALEH OBAISI, M.D., | ) | |
| and TIMOTHY J. FAHY, M.D., | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Isaac Perez alleges that Dr. Timothy Fahy, Dr. Saleh Obaisi,[1] and Wexford Health Sources, Inc. ("Wexford") were deliberately indifferent to his eye and back conditions during his incarceration at Stateville Correctional Center ("Stateville"). (Amend. Comp. (Dkt. No. 10) ¶¶ 1–4, 26, 30–32, 34–36.) Before us is Defendants' motion for summary judgment. (Mot. (Dkt. No. 52).) For the reasons set forth below, we grant Defendants' motion.

## BACKGROUND

The facts outlined hereafter are taken from the parties' Local Rule 56.1 statements and are undisputed unless otherwise noted.

Perez is incarcerated and has been living at Stateville since 2013. (Defs.' Statement of Facts ("Defs.' Facts") (Dkt. No. 53) ¶ 4.) Perez experienced recurring left eye and back

---

[1] Dr. Obaisi is deceased and so his estate is listed as a party. His estate is represented by Independent Executor Ghaliah Obaisi. (Defs.' Statement of Undisputed Facts ("Defs.' Facts") (Dkt. No. 53) ¶ 7; Dkt. No. 28 (Substituting the Estate of Saleh Obaisi in place of Saleh Obaisi as a defendant in this case).) We refer to Dr. Obaisi's estate, Dr. Fahy, and Wexford collectively as "Defendants."

problems while incarcerated that prompted him to seek medical treatment from the Illinois Department of Corrections ("IDOC"). IDOC provides care to inmates, in part, by contracting with Wexford. (*Id.* ¶ 5.) Wexford in turn hires physicians and other medical staff who provide direct care to Stateville's inmates. (*Id.* ¶ 5.) Drs. Obaisi and Fahy were employed by Wexford and provided medical care to Perez. (*Id.* ¶¶ 6–7, 22, 62.)

## I. PEREZ'S LEFT EYE

Perez first started having eye problems while incarcerated in 2014. (Perez Decl. (Dkt. No. 62–1) ¶ 1; Perez Dep. (Dkt. No. 53–1) at 22.) Perez testified that blurry vision, watery eyes, and fluid discharge prompted him to request an appointment with an optometrist. (Perez Dep. at 22–23; Perez Decl. ¶¶ 1–2.)

### A. Perez's Initial Eye Appointments

Perez's eyes were initially examined in November 2014. (Pl.'s Add. Statement of Undisputed Facts ("Pl.'s Facts") (Dkt. No. 59) ¶ 3; Dkt. No. 59–1 at 2.) The examining optometrist observed that Perez complained of blurry vision in his left eye and may have had a previous episode of Central Serous Retinopathy ("CSR").[2] (Dkt. No 59–1 at 2.) CSR occurs when fluid accumulates in retinal tissue and can manifest as blurry or distorted vision, or grayness in the central area of a patient's vision. (Fahy Dep. at 6–7, 19; Defs.' Facts ¶ 25.) It is unknown what causes CSR, but it is often temporary. (Defs.' Facts ¶ 25.) Perez's eyes were examined again about nine months later. (Pl.'s Facts ¶ 5; Dkt. No. 59–2 at 2.) The examining physician noted that there was "no change in [Perez's] Retina," and his left eye was "quiet." (Dkt. No. 59–2 at 2.)

---

[2] CSR is also known as idiopathic central serous chorioretinopathy ("ICSC"), (Defs.' Facts ¶ 25) and is referred to as such in some of the parties' documents. We use CSR for consistency.

2

### B. Perez's Appointments with Dr. Fahy

Dr. Fahy first saw Perez on December 2, 2016 for a general eye checkup. (Defs.' Facts ¶ 22; Fahy Dep. at 13.) Dr. Fahy did not review Perez's medical records before the checkup. (Fahy Dep. at 11.) Dr. Fahy observed that Perez had irritated eyelids and mucus discharge from both eyes, and diagnosed him with "atopic conjunctivitis," for which he proscribed anti-inflammatory eyedrops. (Defs.' Facts ¶ 22; Perez's Med. Recs. (Dkt. No. 57) at 64.) Dr. Fahy also ordered Perez glasses and told him to follow up in a week. (Defs.' Facts ¶ 22.)

At Perez's follow-up appointment on December 12, 2016, Dr. Fahy diagnosed Perez with CSR in his left eye and referred him to an ophthalmologist. (Defs.' Facts ¶¶ 23–24, 51; Med. Recs. at 62.) Dr. Fahy testified that as an optometrist, his only treatment option when presented with CSR is to refer the patient to a specialist. (Fahy Dep. at 22; Defs.' Facts ¶ 52.) He also testified that he has previously encountered two patients with CSR and that he referred them both to an ophthalmologist. (Fahy Dep. at 9.)

Wexford utilizes a review process when patients are referred for offsite treatment or to a specialist. (Defs.' Facts ¶ 18–19.) Referrals are reviewed by the "Wexford Collegial Review Board" ("Review Board") that consists of physicians and nurses who determine whether recommended treatments should be approved. (*Id.*) In December 2016, the Review Board approved Dr. Fahy's referral to an ophthalmologist and Perez was eventually scheduled for an appointment at the University of Illinois at Chicago's ("UIC") Ophthalmology clinic. (*Id.* ¶ 26.)

### C. Perez's Ophthalmology Appointment and Dr. Fahy Follow Up

Perez was seen at UIC on May 11, 2017, approximately five months after Perez's appointment was approved. (*Id.* ¶ 28.) It is unclear why there was such a long delay, but it is undisputed that Dr. Fahy does not have control over UIC's scheduling processes. (Pl.'s Resp. to

3

Defs.' Facts (Dkt. No. 59) ¶ 53.) The ophthalmologist that examined Perez did not diagnose him with CSR. (Defs.' Facts ¶ 28; Med. Recs. at 62.) Rather, the UIC ophthalmologist diagnosed Perez with "myopia astigmatism" (nearsightedness), recommended that he wear his glasses full time, and instructed him to follow up in a year. (Defs.' Facts ¶¶ 28–29.)

Dr. Fahy saw Perez less than a week later and observed that the fluid in Perez's eyes were receding and his vision was improving, but Perez still had CSR. (*Id.* ¶ 31.) Dr. Fahy instructed Perez to follow up in three months or as needed if his vision worsened. (*Id.*) Dr. Fahy saw Perez again four months later. (*Id.* ¶ 32.) At the appointment, Perez complained that the vision in his left eye was reduced and that he had lost contrast sensitivity. (*Id.*) Dr. Fahy thereafter referred Perez to another specialist, however, instead of referring Perez to an ophthalmologist, he referred him to a retina specialist. (*Id.* ¶¶ 32–33.) A retina specialist is a tertiary care eye physician that is more highly specialized than an ophthalmologist. (*Id.* ¶ 51.)

### D. Perez's Retina Specialist Appointment and Dr. Fahy Follow Up

On March 6, 2018, Perez was seen by a retina specialist, Dr. William F. Mieler. (*Id.* ¶ 35.) Dr. Mieler diagnosed Perez with CSR and recommended he be treated with photodynamic therapy ("PDT"). (*Id.* ¶¶ 35–36.) But the Review Board did not approve Dr. Mieler's recommendation for Perez to receive PDT. (*Id.* ¶ 39; Med. Recs. at 43.) Rather, it determined that Perez's diagnosis should be confirmed and that it needed "written confirmation" from UIC's Retina Clinic that PDT was an "FDA approved treatment for CSR." (Med. Recs. at 43; Defs.' Facts ¶ 39.) While the Review Board waited for confirmation, Dr. Fahy saw Perez again and noted that Perez's vision was still blurry and he was experiencing light sensitivity for which Dr. Fahy ordered Perez tint for his glasses. (Defs.' Facts ¶ 40; Med. Recs. at 105.) Not long thereafter, a Wexford physician affirmed the Review Board's denial. (Defs.' Facts ¶ 42.) That Wexford physician concluded that PDT treatment should be denied because it is not FDA

4

approved for the treatment of CSR and an article from UIC indicated that while PDT appears beneficial, further studies are needed. (*Id.*; Med. Recs. at 80.)

Dr. Fahy saw Perez again on April 9, 2018. (Defs.' Facts ¶ 43.) During the appointment, Dr. Fahy noted that there had been no improvement in Perez's left eye and that he still had CSR. (*Id.*; Med. Recs. at 107.) Dr. Fahy then referred Perez back to UIC's retina clinic for a new treatment plan. (Defs.' Facts ¶ 44; Med. Recs. at 100.) Before Perez could get an appointment, Dr. Fahy saw him again on July 30, 2018. (Defs.' Facts ¶ 47.) Dr. Fahy observed that there was "significant [visual] improvement" in Perez's left eye but recommended that Perez still attend his UIC appointment. (Med. Recs. at 108; Defs.' Facts ¶ 47.)

Perez was finally seen at UIC's retina clinic by Dr. Mieler on September 19, 2018. (Defs.' Facts ¶ 48.) Dr. Mieler found that there was "almost complete resolution" of Perez's CSR and concluded that "[b]ased on the spontaneous improvement," Perez's condition should continue to be observed and there was a good chance his eye would stabilize. (Med Recs. at 101–02; Defs.' Facts ¶ 48.) Dr. Meiler recommended that Perez follow up in four to six months, or request another appointment if any issues developed. (Med. Recs. at 101–02.)

Perez asserts that he saw Dr. Meiler again approximately ten months later, on July 24, 2019. (Perez Decl. ¶ 14; *see also* Dkt. No. 59–3 at 2.) Perez claims that at this appointment, Dr. Meiler once again recommended PDT treatment. (Perez Decl. ¶ 14; *see also* Dkt. No. 59–3 at 2.) However, Perez still has not received PDT and asserts that he continues to experience fluid discharge, blurred and wavy vision, and light sensitivity in his left eye. (Perez Decl. ¶ 16.)

## II. PEREZ'S BACK

While incarcerated Perez complained of chronic lower back pain due likely to an injury he received from a fall he had as a child. (Defs.' Facts ¶¶ 55–56.) So, Perez was referred to UIC

5

orthopedics for his back pain and was examined by Dr. El Shami in September 2015. (*Id.* ¶ 56.) Dr. El Shami concluded that Perez likely had a herniated disk or spinal stenosis and recommended magnetic resonance imaging ("MRI"). (Med. Recs. at 2.) Perez received an MRI on October 30, 2015 that showed degenerative changes to his lumbar spine and discs, and mild bilateral neuroforaminal stenosis in multiple vertebrae. (Defs.' Facts ¶ 59.) About a month after Perez's MRI, Dr. Obaisi granted him year-long low gallery and low bunk permits on December 1, 2015. (Pl.'s Facts ¶ 17; Dkt. No. 59–4 at 2.) A low gallery permit allows inmates to be celled on a floor that minimizes the number of stairs they need to climb. (Pl.'s Facts ¶ 18.)

### A. Initial Treatment of Perez's Back

Dr. El Shami saw Perez for a follow up appointment on February 17, 2016. (Defs.' Facts ¶ 60.) Dr. El Shami noted that Perez had "multilevel lumbar disc herniations" and "mild lumbar central canal stenosis," and concluded that Perez was suffering from "degenerative disc disease [of the] lumbar spine." (Med. Recs. at 53.) Based on these assessments, Dr. El Shami recommended that Perez receive a lumbar epidural steroid injection ("LESI"), continue taking gabapentin (a pain medication), be handcuffed in front with waist chains, and follow up two months after his LESI treatment. (Defs.' Facts ¶ 60.)

Dr. Obaisi saw Perez on February 17, 2016 following his visit with Dr. El Shami at UIC Orthopedics. (*Id.* ¶ 62; Med. Recs. at 25.) Dr. Obaisi noted that Perez suffered from degenerative joint disease of the spine and that there was "no change" to his condition. (*Id.*) Dr. Obaisi evaluated Perez at least two more times over the next six months. (Defs.' Facts ¶¶ 64–66.) During both appointments, Dr. Obaisi noted that there was "no change" to Perez's medical condition and continued to proscribe Perez pain medication. (*Id.*; Med. Recs. at 22, 24.) Perez was also referred to and seen by providers at UIC's pain clinic, who also recommended LESI treatment. (Defs.' Facts ¶ 66.)

6

On August 15, 2016, Perez received LESI treatment. (Defs.' Facts ¶ 68.) Dr. Obaisi saw Perez immediately following his LESI treatment and one month later. (*Id.* ¶¶ 68–70.) During both appointments, Dr. Obaisi noted that there was still "no change" regarding Perez's back. (Med. Recs. at 20–21.)

### B. Perez's Low Gallery Permit and his Fall

Perez's yearlong low gallery and bunk permits were scheduled to expire on December 1, 2016. (*Id.* at 70.) Before expiration, Perez saw Dr. Obaisi regarding renewal. (Defs.' Facts ¶ 72.) Dr. Obaisi noted that Perez was suffering from lower back pain, had received LESI treatment, and that there was "no acute change" to his back. (Med. Recs. at 19; Defs.' Facts ¶ 72.) However, Dr. Obaisi did not renew Perez's low gallery permit, he only renewed his low bunk permit. (Defs.' Facts ¶ 72.) Perez testified that during his appointment, Obaisi said that he would not renew Perez's low gallery permit and stated that the warden was "giving him a hard time" about the number of permits being issued and accordingly "had to give [Perez] a hard time." (Perez Decl. ¶ 21.) A few days later, Perez's lower gallery permit expired. (Defs.' Facts ¶ 75.)

Perez alleges that he fell down the cellhouse stairs on December 23, 2016.[3] (Pl.'s Facts ¶¶ 22–23; Defs.'s Facts ¶ 76.) The Licensed Practical Nurse who examined Perez after the fall noted that he did not have any redness, scrapes, or bruising to his back or leg and he had full range of movement in all extremities. (Def.'s Facts ¶ 76.) The same Licensed Practical Nurse also observed that Perez was able to use a wheelchair after the alleged fall to transport himself without grunting, grimacing, or any distressed look on his face. (*Id.* ¶ 76.) He was then admitted

---

[3] The parties appear to dispute whether Perez fell in the first place by referring to his fall as "self-reported" and noting certain inconsistencies in Perez's retelling of the fall. (*See* Defs. Facts ¶ 76; *see also* Defs.' Resp. to Pl.'s Facts (Dkt. No. 67) ¶ 22.) This factual question is immaterial because even if he did fall, it would not show deliberate indifference.

7

for a 23-hour observation period where he did not voice any complaints. (*Id.*)  A physician examined Perez the next day and ordered x-rays that showed degenerative changes to Perez's spinal disks but no fracture.  (Defs.' Facts ¶¶ 78–79; Med Recs. at 69.)  The physician granted Perez a two-week low gallery, slow walk, and crutches permit.  (Defs.' Resp. to Pl.'s Facts ¶ 27; Dkt. No. 59–6 at 2.)  One week later, the same physician extended Perez's low gallery permit for two months.  (Defs.' Facts ¶ 80; Dkt. No. 59–7 at 2.)

Approximately two months later, Dr. Obaisi examined Perez again and renewed his low gallery permit.  (Defs.' Facts ¶ 82.)  Over the next ten months, up until Dr. Obaisi's passing in December 2017, Perez had multiple appointments with Dr. Obaisi, other Stateville doctors, and UIC providers who all continued to either renew or recommend renewal of Perez's low gallery permit even though Perez continued to receive LESI, pain medication, and physical therapy.  (*Id.* ¶¶ 83–96.)  Perez's permits have also been renewed several times since Dr. Obaisi's passing.  (*Id.* ¶¶ 97–99, 111; Dkt. No. 59–7 at 6.)

## STANDARD OF REVIEW

Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted).  Once the moving party meets this

burden of production, the nonmoving party may not rest upon the mere allegations or denials of the adverse party's pleading but rather must set forth specific facts showing that there is a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 256–57, 106 S. Ct. at 2514. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

## ANALYSIS

Perez alleges that Dr. Fahy and Dr. Obaisi violated his constitutional rights by demonstrating deliberate indifference to his serious eye and back conditions. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") (Dkt. No. 58) at 8–13.) He also argues that Wexford's collegial review process is constitutionally deficient because it is a barrier to adequate care that dangers patient safety. (*Id.* at 13–15.)

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976)). To prove deliberate indifference, a detainee must demonstrate that: "(1) an objectively serious injury or medical need was deprived; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it." *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). The second prong "requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997); *see also Johnson v. Doughty*, 433 F.3d 1001, 1018 (7th Cir. 2006). To determine whether a defendant knew of and disregarded a substantial risk requires assessment of their "subjective state of mind," which is often shown through circumstantial evidence. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir.

9

2016). For example, the plaintiff may present evidence that their request for medical assistance was ignored or point to the defendant's specific medical treatment (or lack thereof) where the risk of the defendant's actions was so obvious that a "factfinder c[ould] infer that [the] prison official knew about it and disregarded it." *Id.* at 729. The standard for showing deliberate indifference "is a rigorous one," where "something more than negligence or even malpractice is required." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quotation omitted).

Defendants argue that summary judgment is appropriate in their favor because Perez has failed to present enough evidence that Drs. Fahy or Obaisi were deliberately indifferent when providing treatment to Perez, or that Wexford was in any way deliberately indifferent. (*Id.* at 5–11, 13.) In so arguing, Defendants concede for the purposes of their summary judgment motion that CSR and chronic degenerative back pain are objectively serious medical conditions. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Mem.") (Dkt. No. 54) at 4.)

## I. PEREZ'S CLAIM AGAINST DR. FAHY REGARDING HIS LEFT EYE

Perez argues that Dr. Fahy was deliberately indifferent to his serious eye condition because Dr. Fahy failed to timely diagnose his CSR and initially sent him to the wrong eye specialist, which delayed his treatment. (Resp. at 11.) Defendants argue that summary judgement is appropriate because the undisputed facts do not support Perez's claims and are insufficient to allow a reasonable jury to conclude that Dr. Fahy consciously disregarded Perez's eye condition. (Mem. at 7–8.)

We agree with Defendants. It took Dr. Fahy two visits and ten days to diagnose Perez with CSR. (Defs.' Facts ¶¶ 22–23.) A delay in diagnosis, by itself, does not constitute deliberate indifference unless that delay was the result of obvious indifference or it can be shown that the defendant substantially departed from the standard of care over the course of their initial assessment and treatment. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663

10

(7th Cir. 2016) (granting summary judgment where plaintiff didn't have "*any* expert testimony indicating that [Defendant's] infection diagnosis and . . . treatment plan departed from accepted medical practice."); *see also Duckworth v. Ahmad*, 532 F.3d 675, 681–82 (7th Cir. 2008) (finding that doctor's delay in diagnosing plaintiff was not deliberately indifferent). Perez has failed to present enough evidence that Dr. Fahy substantially deviated from the standard of care. Rather, the evidence before us suggests that Dr. Fahy was diligent in his treatment of Perez. As soon as Dr. Fahy diagnosed Perez with CSR, he referred him to a specialist. (Defs.' Facts ¶¶ 23–24.) Perez concedes that Dr. Fahy's only treatment option when presented with CSR is to refer the patient to a specialist. (Pl.'s Resp. to Defs.' Facts ¶ 52.) Dr. Fahy also re-referred Perez to a retina specialist for a new treatment plan after Wexford refused to grant Perez PDT treatment. (Defs.' Facts ¶ 44.) Further, Perez admits that Dr. Fahy's treatment was consistent with community medical standards. (Pl.'s Resp. to Defs.' Facts ¶ 54.) Because Perez has failed to present evidence that would allow a reasonable jury to conclude that Dr. Fahy acted with deliberate indifference, we grant Defendants' summary judgment with respect to Perez's claim against Dr. Fahy.

Perez's initial referral to an ophthalmologist instead of a retina specialist does not change this result. As a general matter, a mistake in professional judgment is not deliberate indifference. *Whiting*, 839 F.3d at 662. When a physician's treatment is called into question, to stave off summary judgment, the plaintiff must present some evidence that the defendant "knew better" than to provide the treatment he or she did. (*Id*. (quoting *Petties*, 836 F.3d at 731). Such evidence may include expert testimony regarding the standard of professional care and a showing that the defendant radically departed from that standard, or in some instances, a doctor's actions may be so obviously risky that a layperson could conclude that defendant acted with the requisite state of mind. *Whiting*, 839 F.3d at 662–63. Dr. Fahy's initial referral to an

11

ophthalmologist instead of a retina specialist is not so obviously risky that a reasonable jury could infer deliberate indifference.

Perez argues nonetheless that Dr. Fahy's treatment was flawed because he did not review Perez's medical records prior to his first appointment and his actions delayed Perez's overall treatment. (Resp. at 11.) Dr. Fahy's failure to review Perez's medical records prior to his initial evaluation, even if it were to constitute negligence, does not rise to the level of deliberate indifference. *See Green v. Wexford Health Sources*, No. 12 C 50130, 2016 WL 1214825, at *11 (N.D. Ill. Mar. 29, 2016) ("At *most*, [defendant's] failure to review [plaintiff's] full medical records and diagnose . . . was negligence.") (emphasis added); *see also Pryor v. Pat*, No. 9 C 472, 2010 WL 4483467, at *4–5 (N.D. Ind. Nov. 1, 2010) (failure to review medical records to determine allergies after plaintiff told defendant he was allergic to some types of antibiotics was not deliberate indifference); *Harris v. Clarke*, No. 6 C 230, 2008 WL 4866683, at *31 (E.D. Wis. Nov. 10, 2008) ("Even if the records were available to [Defendant] . . . and he did not review them . . . [Defendant] may have been negligent, but more than negligence is required."). Perez has also failed to present sufficient evidence that any delays in Perez's treatment were a result of Dr. Fahy's alleged deliberate indifference. Perez admits that Dr. Fahy has no control over the UIC scheduling process (Pl.'s Resp. to Def.'s Facts ¶ 53) and as outlined above, nothing about Dr. Fahy's ten-day delay in diagnosing Perez with CSR or his initial referral to an ophthalmologist would allow a reasonable jury to conclude that Dr. Fahy consciously disregarded Perez's eye condition.

## II. PEREZ'S CLAIM AGAINST DR. OBAISI'S ESTATE REGARDING HIS BACK

Perez alleges that Dr. Obaisi was deliberately indifferent to his serious medical needs by having refused to renew Perez's low gallery permit. (Resp. at 8–10.) A low gallery permit advises IDOC to house an inmate on the bottom floor, if possible, to limit the number of stairs

climbed by an inmate. (Def.'s Facts ¶ 73.) Perez's theory is that the decision to not renew his low gallery permit led him to fall down cell house stairs on December 23, 2016. (*Id.* ¶ 76.) In other words, Perez sued Dr. Obaisi for not writing him a doctor's note that would have excused him from using stairs to go to and from his cell. Defendants contend that Perez failed to present enough evidence that Dr. Obaisi acted with the requisite state of mind when declining to renew Perez's low gallery permit because his decision to not renew the permit was the result of Dr. Obaisi exercising medical judgment. (Mem. at 10–11.) Perez responds that Dr. Obaisi's mental state can be inferred from the fact that Dr. Obaisi originally granted him a low gallery permit, was aware Perez was suffering from chronic lower back pain and had a history of falls[4], and nevertheless told Perez that he was not renewing his permit because the warden was "giving him a hard time" about the number of permits being issued and therefore "had to give [Perez] a hard time." (Resp. at 8–10 (quoting Perez Decl. ¶ 21).) For the following reasons, we hold that no reasonable jury could find that Dr. Obaisi showed deliberate indifference to Perez's health or safety by not renewing his low gallery permit. Accordingly, we grant Defendants' motion for summary judgment with respect to the claims against Dr. Obaisi.

     A prison official is deliberately indifferent to a prisoner's health in violation of the Eighth Amendment only if he "knows of and disregards an excessive risk to inmate health or safety." *Sellers v. Henman*, 41 F.3d 1100, 1103 (7th Cir. 1994) (quoting *Farmer v. Brennan*, 511 U.S.

---

[4] The parties disagree as to whether Dr. Obaisi had full knowledge of Perez's history of falls related to his back pain. Perez's deposition testimony is that he has fallen only two other times while incarcerated. (Def.'s Facts ¶ 115 (citing Perez Dep. 64:1–68:21).) These two other falls occurred when he was getting out of a top bunk and while standing on a table trying to cover a window with a blanket. (Def.'s Facts ¶ 115.) Nothing suggests that either of these falls were caused by back pain. Nor do we see any facts to suggest that Perez has a history of falls specifically caused by his back pain. (*See generally* Med. Recs.) Accordingly, we agree with Defendants in that Perez's medical records do not reflect any history of falls related to back pain prior to Dr. Obaisi's decision to not renew the low galley permit.

13

825, 837, 114 S. Ct. 1970, 1979 (1994)). A prison official is free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citing *Farmer*, 511 U.S. at 843, 114 S. Ct. at 1983)). Medical decisions that are matters for medical judgment, such as one medical treatment over another, are beyond the Eight Amendment's purview. *See, e.g.*, *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Further, mere disagreement with a doctor's recommended course of treatment does not constitute deliberate indifference. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285 (1976)).

The record before us demonstrates that Dr. Obaisi employed professional judgment in deciding not to renew Perez's low gallery permit. True, evidence on the record suggests that Dr. Obaisi was pressured to decrease the number of low gallery permits he issues and so he had to give Perez "a hard time,"[5] but that does not create a question of fact as to whether Dr. Obaisi acted in disregard of an excessive risk to Perez. (Pl.'s SOF ¶ 21; (Perez Decl. ¶ 21.) On the contrary, Dr. Obaisi's decision to not renew the permit was based on objective medical evidence. Indeed, Dr. Obaisi considered that since the low gallery permitted was first issued Perez had undergone a year's worth of ongoing pain management treatment for his back condition, had

---

[5] Specifically, Perez testified that Obaisi stated that the warden "was giving him a hard time" about the number of permits being issued and so he "had to give [Perez] a hard time." (Perez Decl. ¶ 21.) Dr. Obaisi deceased about one month after the lawsuit was filed, but before Perez's deposition testimony as to Dr. Obaisi's statement regarding the pressure to issue less low gallery permits. (Dkt. Nos. 1, 22 ¶ 1, 62-1 (Perez Decl.) ¶ 21.) We consider Perez's testimony as to this statement because it falls within the "state-of-mind" hearsay exception. "Under the state-of-mind exception, a hearsay statement is admissible if it '[expresses] the declarant's state of mind at the time of the utterance,' i.e., his intentions, plans or motivations." *Ruhl v. Hardy*, 743 F.3d 1083, 1099 (7th Cir. 2014) (quoting *People v. Lawler,* 142 Ill.2d 548, 559, 568 N.E.2d 895, 900 (Ill. 1991)). We conclude that Perez's testimony, while hearsay, expresses and is relevant to Dr. Obaisi's motive for not renewing the low gallery permit.

14

been seen by a specialist for it, received a lumbar epidural steroid injection for it, often had no complaints at doctor's appointments (*see, e.g.*, Def.'s SOF ¶¶ 62, 64, 66, 69), and had no acute changes in condition when he made the decision not to renew the low gallery permit. (*Id.* ¶¶ 60–72.) Further supporting our conclusion that Dr. Obaisi's determination was appropriate is that a nurse observed Perez walking up stairs to the cell house's second level without having showed signs of acute distress just two days following Perez's request for a low gallery permit renewal. (*Id.* ¶ 74.) Thus, we conclude that no reasonable jury could find that Dr. Obaisi declining to renew Perez's low gallery permit was anything but the result of him exercising his medical judgment, was a reasonable response to any risk associated with Perez's use of stairs, and did not disregard an excessive risk to Perez's health or safety.

### III.     CLAIM AGAINST WEXFORD

Perez argues that Wexford's collegial review process is a danger to the safety of patients. (Resp. at 13–15.) A private corporation providing healthcare to inmates may be liable for violations of an inmate's constitutional rights if the "moving force" behind those violations were the defendant's "official policy, widespread custom, or action by an official with policy-making authority." *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016); *see also Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) ("For now, this circuit's case law still extends [to certain § 1983 claims] from municipalities to private corporations."). "To prove an official policy, custom, or practice . . . [the plaintiff] must show more than the deficiencies specific to his own experience." *Daniel v. Cook Cty.*, 833 F.3d 728, 734–35 (7th Cir. 2016). Rather, in the absence of direct proof of an official policy, the plaintiff must present evidence "that could allow a reasonable trier of fact to find . . . 'systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system.'" *Id.* (quoting *Dixon*, 819 F.3d at 348.)

15

To support his argument, Perez submits an expert report filed in *Lippert v. Ghosh, et al.* No. 10 C 4603 (N.D. Ill. 2015) (the "Lippert Report") that he claims challenges the review process. (Dkt. No. 62–3.) Perez argues that the Lippert Report combined with his own experience in not receiving PDT treatment for his eye raises questions of fact regarding whether Wexford's collegial review process is constitutionally deficient. (Resp. at 13–15.) But District courts have repeatedly held that the Lippert Report is inadmissible and may not be used to defeat summary judgment. *See Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 WL 1436963, at *5 (N.D. Ill. Apr. 24, 2017) (collecting cases and concluding that the report is inadmissible unless offered to show what an official may have known); *see also Gaston v. Ghosh*, No. 11 C 6612, 2017 WL 5891042, at *14, n.19 (N.D. Ill. Nov. 28, 2017), *aff'd*, 920 F.3d 493 (7th Cir. 2019) ("[The Lippert] report is inadmissible hearsay."); *Thomas v. Studer*, No. 16 C 8718, 2018 WL 5024957, at *5 n.1 (N.D. Ill. Oct. 17, 2018) (refusing to rely on report).

The only other evidence Perez offered is his own left eye treatment. However, these facts are not enough to show an official policy, custom, or practice. *Daniel*, 833 F.3d at 734–35; *see also Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014) (referral to the wrong doctor and failing to correct mistake was insufficient). Unlike previous cases where plaintiffs defeated summary judgment by relying on testimony from correctional and medical staff regarding deficiencies in care in addition to their own personal experience, Perez has presented no additional evidence from which a policy, custom, or practice could possibly be inferred. *See, e.g.*, *Daniel*, 833 F.3d at 735 (denying defendant's summary judgment motion where plaintiff provided evidence of personal experience and "extensive testimony from [j]ail medical staff"); *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) (same result where plaintiff pointed to

16

personal experience and testimony from a pharmacist, correctional officer, social worker, and other circumstantial evidence).

Because Perez has failed to present evidence outside of his own experience that Wexford had an official policy or widespread custom that was the "moving force" behind his alleged constitutional violations, we grant Defendants summary judgment with respect to Perez's claim against Wexford.

## CONCLUSION

Even viewing the summary judgment record in the light most favorable to Perez, we conclude that no reasonable person could find in his favor. For the reasons stated above, we grant Defendants' motion for summary judgment (Dkt. No. 52), and this case is dismissed in its entirety. It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: November 6, 2019
       Chicago, Illinois